## THE LOTTIE BENNETT (four cases).
### Nos. 21251, 21256, 21191, 21257.

District Court, N. D. California, S. D.
March 29, 1933.

Lelia R. Leep and Wm. Shutz, both of San Francisco, Cal., for libelants E. H. Burns, R. G. Chadwick, and F. W. Anderson and others.

S. T. Hogevoll and Jos. W. Robb, both of San Francisco, Cal., for libelant Hans Rohde.

Thos. D. Aitken, of San Francisco, Cal., for libelee and respondents.

KERRIGAN, District Judge.

The libelants and the libelees, together with others, were parties to a fishing enterprise. Libelee Frank Harris was the owner of the schooner Lottie Bennett. He with his brother and libelee Robert Piercy advertised in San Francisco newspapers the organization of a salmon fishing trip to the waters of Alaska. By this means they contacted certain of the libelants in a room or office apparently procured for the purpose. To them it was represented that the Lottie Bennett was seaworthy and fully equipped for the proposed fishing venture; that, if fifteen men could be gotten together who would each contribute $800, Harris would furnish the vessel, the seamen, and experienced fishermen, and that the money thus contributed would be used to purchase supplies of food, barrels, salt, etc. An initial deposit of $150 was to be made in escrow with a well-known national bank in San Francisco, and, when the fifteen men should be found and the $12,000 collected, the vessel would be ready to sail within forty-eight hours thereafter. Piercy was the high-powered promoter. The proposition was painted in glowing colors, and it was roughly estimated that a profit of $40,000 was to be made. It looked attractive, and the required number of adventurers was found, among them being a graduate of the University of California and teacher in the public schools of Berkeley, a civil engineer, and an iron worker. Several gave up steady jobs in order to become members of the project. None of them were seamen nor had any of them experience in commercial salmon fishing. Each of the participants or shareholders was to receive an agreed proportion of the catch, as

were also the sailors, officers, and owner of the vessel.

There were in all twenty-five men interested in the enterprise, and they signed shipping articles and a formal contract embracing the terms of their agreement. They failed, however, to get the co-operation of the fish, and the venture was doomed to dismal failure from the beginning.

They set sail on the afternoon of May 22, 1932. At the time of their departure the hatches were open and the stores were piled on the main deck. With the exception of the captain and perhaps two others, all on board were drunk; the first mate (who was at the wheel) was so intoxicated that he could not follow the tug and had to be relieved by one of the adventurers, a former truck driver on a milk route, the captain encouraging him in his novel task by the remark, "You have driven a truck and know how to dodge trees and things. You ought to know how to steer a ship clear of rocks and other objects." Due to negligence of the cook, the cooking range was not fastened to the floor of the galley, nor was it equipped with rolling irons; and upon the pitching or rolling of the vessel in passing out the Golden Gate the containers of hot water and coffee slid off the range and scalded the cook, as the result of which he was confined to his berth for 28 days. Some of the crew were 3 days recovering from their intoxication; others suffered for a week. Nearly all the shareholders were seasick.

Another vessel, the Ohio No. 3 (which was to meet the Lottie Bennett at a certain point and give her a tow), left San Francisco about May 19th and went to Seattle. It was to leave that port at 10 o'clock one night when the wind and tide were favorable, but the school teacher and another member of the venture did not return from shore leave until 12 hours later, which caused the Lottie Bennett to miss connections with the Ohio, and for this and other reasons the former was late in arriving at the fishing grounds in Alaska.

Omitting other harrowing details of the voyage north, and passing to their arrival in Alaskan waters, it appears that the troubles of these optimists had but just begun. There were complaints that the fishing equipment was wholly inadequate, there being no suitable fishing boats or satisfactory fishing nets, and that part of the funds collected had been improperly used to outfit the ship. The shareholders with few exceptions each thought he was the leader of the venture and acted accordingly, particularly shunning hard work. They, with other members of the crew,

caught and packed 90 barrels of salmon. Then the adventurers headed for Dutch Harbor, where they had been led to believe brighter prospects awaited them. Here again the Ohio was to give them a tow, and again they missed her. After trying in vain for a week or 10 days to reach the harbor, which they failed to do principally on account of unfavorable weather conditions, a meeting was called for the purpose of surveying the situation. It was then made apparent that, even if they reached Dutch Harbor, the prospects of success were not bright, and, since they had on board only enough supplies to last 30 days—the estimated sailing distance from San Francisco—it was decided to set the course for home.

On the way back there were recurring disputes, misunderstandings and fights; they were short of food. Shortly after the arrival, one of the crew had a stroke, which he now claims to have resulted from starvation. They arrived in port September 15, 1932, as they left—practically all on board drunk. Capt. Harris advised the crew that the remaining supplies and the 90 barrels of fish belonged to them to do with as they wished. Now, instead of having many captains, there were many salesmen, and confusion resulted. Sales were finally made, and the amounts received by the individual members of the enterprise ranged from $2.50 to approximately $75.

The shareholders, according to some of the testimony, had expected the venture to be something akin to a yachting cruise—that they would work the ship or fish only when they felt like it, and that most of the hard work would be done by the other fellow. An illustration of their conception of the character of their undertaking may be given; namely, the school teacher was on duty at the wheel while the ship was moving slowly. Seeing what he believed to be an opportunity to take a good moving picture, he left the wheel unattended, and a serious accident was narrowly averted.

Another time, and when the fish were running, some of the single members of the enterprise took a motorboat, and with whisky and women (Eskimos) went on a sight-seeing trip. No more complete failure of a venture has come to my judicial attention. It is a sorry mess. Some of the participants put into it the savings of years. But there is no evidence that Harris misappropriated any of the money contributed. Everyone lost money and time. I am unable to find that there was any fraud or deception committed. But,

even if I could find that there was, the libelants' victory would, I think, be as barren as their venture, for it is plain that the two brothers Harris and Piercy, like thousands of others these days, are judgment proof, and I feel certain that little or nothing would be realized out of a sale of the Lottie Bennett, a sailing vessel, there being little or no market at present for vessels of that type.

In the Rohde case it is alleged that the libelant was engaged as a seaman and as an expert packer and cooper, for $150 per month, and a percentage of the catch; that he received on account $200 and claims a balance of $300; that, this sum not having been paid when due, the respondents are liable in double that sum. He also alleges that on account of the character of the food furnished on the home voyage of 36 days that he was rendered totally and permanently disabled, and for this reason he prays for $2,000. Respondents deny each of the allegations of the libel.

In the Burns case libelant alleges that he was employed as the chief cook; that there is due him as wages $400. In a second cause of action he alleges that, on account of the unseaworthiness of the ship, he was scalded by the hot water, and for this injury he seeks to recover $5,000 damages. To this libel there is a general denial.

In the Anderson case the libelants are what is known as shareholders in the venture. They contributed various sums of money to the venture, and they claim that there was misrepresentation and fraud on the part of respondents Frank Harris, Jack Harris, and Robert Piercy, and they seek to recover the amount contributed by them respectively, and $1,500 each in addition as damages on account of injuries resulting from the lack of proper and wholesome food and for loss of time.

In the Chadwick case, the libelants in that case are seamen, and their libel is for wages and for damages for injuries. They allege three causes of action, two of them are based on misrepresentation as to the proper equipment of the vessel for the fishing venture and to neglect and carelessness; hence that the catch of fish was small, resulting in damages to each of them in the sum of $500. The third count is based on injury to health on account of lack of wholesome food. Here there is also a specific general denial.

I find that Rohde was not to get $150 per month; that advances made to him were on account of his proportion of the expected catch; that he, like all the others, is bound by the terms of the shipping articles. I also find that the stroke which he suffered after the voyage was concluded was a second stroke, and was not caused, as alleged, by reason of the poor food.

I find that Burns, under the terms of the shipping articles, was to receive a proportion of the catch, and is not entitled, as alleged, to wages in the sum of $400. As to the personal injuries suffered by him, I find that they were due to his own negligence.

As to the Anderson case (the shareholders), I find that there was no misrepresentation or fraud practiced on them by either of the Harrises or Piercy, and that they are not entitled to the return of the amounts of money contributed by them respectively, nor to damages for injuries due to lack of food.

In the Chadwick case I find that these libelants, seamen, are bound by the terms of the shipping articles, and not entitled, as claimed, to wages; that as to them that there was no misrepresentation or fraud, nor are they entitled to any damage on account of the quality of food.

It is therefore ordered that a decree be entered in favor of libelees without costs to either party.

In view of the foregoing, no formal findings are deemed necessary, and this memorandum will stand as my findings in these cases and let decree be entered accordingly.